Good morning, your honors. May it please the court, Anthony Dane, appearing for Mr. Moser. Because there were multiple motions, at least two of the defense groups want to argue, I may reserve at least five and possibly more minutes for rebuttal. This case has had a long and winding road to this point. This is our second time up here before the Court of Appeal. What started out as a case of a general counsel finding financial irregularities and being fired comes here because a settlement agreement was reached, which had very specific terms. And in a subsequent disclosure used to sell stock, the defendants breached the contract, the settlement agreement induced a breach, and in part defamed Mr. Moser through parts of the disclosure. I want to address the most specific issue with respect to the statute of limitations in that there were numerous publications in this case, and the defendants admit there were numerous publications. Not only in their briefing did they state there were at least four publications, the S-1 registration, the S-1A registration, a first prospectus for sale, and a second separate prospectus. Well, I look at this, and it seems to me the undisputed facts show that the same prospectus printed in September 2003 was distributed to potential buyers after October 21, 2003. How do you distinguish kineric versus bubliose? How is the prospectus different from all copies of the first edition of a hardcover book that gave rise to just one cause of action? Thank you. There are several reasons. The first is we can even draw from defendants general counsel Ms. Pruitt's declaration. She says there were two separate prospectuses. There's no evidence, and I want to make this clear. These are defendants' affirmative defenses. They're required to present some evidence. We were the only ones who presented evidence in this case. But if you take Ms. Pruitt's supplemental declaration, she says there were two separate prospectuses. Nowhere is there any evidence these were identical prospectuses. Moreover, a prospectus is not a book. It's not a hardcover book. It is a legal document that is required to be delivered at that time, physically delivered to requesting investors. And in this case, each of the press releases, the first and the second, were specific to the stock sold in that case. The first press release said these securities will be sold pursuant to a prospectus. That was the first prospectus. The second prospectus on October 21st was limited to the over allotment of securities to a new audience. So, in fact, Bugliosi in that case supports our position. It was an entirely new audience. The press release for the second prospectus on October 21st said prospectuses may be obtained from the following underwriters, and they gave physical addresses. So it required a prospective investor to request a physical delivery. That's similar to the Schneider case in which you have the identical information presented to TRW and then requesting creditors were individually given that defamatory material. And each one, each one was a new publication. Well, it was a different audience, but wasn't the prospectus the same? There's no evidence, in fact, the prospectus was the same. What Ms. Pruitt says in her declaration... Is there evidence that it was not the same? That's my point. We're not required. It's not our defense. It's an affirmative defense. The defendants are required to present evidence, one, that it's an identical document. And even, again, Bugliosi says it can be the identical defamatory information, but it's intended to reach a new audience, and that makes it a separate publication. So what we have, if you look at Ms. Pruitt's declaration, she says there were two prospectuses. Moreover, we presented a statement of facts, and in Statement of Facts 147 and 153, the defendants, Schor and Treyarch, admitted as undisputed, and the other defendants did not dispute, the exact term that a separate prospectus was used to sell stock on or after October 21, 2003, and that those separate prospectuses were delivered to requesting investors after October 21, 2003. So whether you call it a new publication or a republication, it was to an entirely different audience. So, therefore, each of those, as defendants admit, each of those are publications. And, in fact, as I said, Schneider is one. Shively came afterwards that even if you use the same defamatory statements, but you repeat them or you present them to the underwriters, in this case, who you know are then going to disseminate that information, it's a separate publication. This is not related to a hardcover book, and, most importantly, prospectuses are regulated. So this isn't as though they were sent to underwriters like bookstores and they put them in their offices. Specifically, a potential investor would have to request physical delivery of that document. That's an entirely, entirely separate and new audience. And, again, all of the defenses, and this is what was so troubling, all of the bases for summary judgment were based on affirmative defenses. The defendants provided no statement of facts in their moving papers. We, on the other hand, provided a statement of facts opposing them. And, in our statement of facts, we showed not only that there was a new publication, but they didn't dispute that. So how, then, at a minimum, and, Your Honor, I guess even more directly, how, at a minimum, does the fact that we don't know whether the prospectus was identical or not create a genuine issue of material fact and dispute created by the defendants? It's not our obligation to prove their affirmative defense. It's theirs. So... Well, does this Kinnerick case help you? I absolutely think all of the cases, including Kinnerick, does. The only difference is it's a paperback novel in that case, and the idea is when you issue a paperback, you're getting a whole new audience, not the ones that bought the hardcover. In this case, as I said, the defendants admitted each was a separate prospectus, and it served a separate purpose. Let me give you even the other publications. When you say the S-1 registration, that's to the SEC. Creditors, analysts may be interested in that. That's their audience. When you issue a prospectus, it's to very specific requesting either brokers, investors, potential investors. It's an entirely separate event. And Ms. Pruitt's declaration actually, although it should have been excluded, helps us. Because what she indicates is that the prospectuses, she doesn't say identical, were printed and shipped in September. But printed and shipped just means it's printed and shipped to the underwriters. It couldn't have gone to the investors. Their sale hadn't closed. It's the underwriters that are required by law and by the underwriters' agreement, all in the record, to physically deliver those prospectuses. And just as in Schneider, each physical delivery after that is a publication to an entirely different audience. And each prospectus, by the way, as a legal document, is an entirely separate document to each of those investors. So Canorac versus Bugliosi supports us. Schneider supports us. In fact, Shively supports us. Every single case. I do want to say those are more... It's not Canorac. Caneric. Caneric. My apologies, Your Honor. I could write a book on Caneric. Okay. So now I know Caneric. I do know Mr. Bugliosi. I don't know Caneric. I know Bugliosi as well. So I pronounced one of them correct. That's all right. But I absolutely believe at a minimum. Once you read my book, you'll find out. And I will pronounce your name correctly, but I'd rather stick with Your Honor. So each one of these is a separate publication, or at least there's a genuine issue of material fact as to that. And this is a theme throughout every one of these affirmative defenses. The district court required us to carry the burden, and if there was a dispute, found against us,  and if we dispute it, it still has to go to trial. So that was the first one with respect to the fact that the October 21st deliveries after that were new publications. Then, moreover, TRIARC was separately sued. TRIARC was not sued for defamation. TRIARC was sued for inducing a breach of a contract because TRIARC was involved in both the drafting of the prospectus and the drafting review and approved the settlement agreement. And therefore, knowing that it was substantially certain to cause a breach, TRIARC induced a breach of contract. That's within the two-year statute of limitations. What the court did is just say if the defamation claim fails, the inducement to breach contract fails. But that's an entirely separate event. It didn't require defamation to breach the contract. The contract required confidentiality. The contract required that any statements be that the issues had been resolved. And the disclosure breached that contract irrespective of defamation. For each of the defendants, in fact, when the defendants were involved in providing that information to the underwriters, they induced a breach of the contract. The October 21st dissemination of the disclosure to the public was an inducement of a breach of contract. The court seemed to conflate that there was a defamation with the fact that the disclosure separately induced a breach of contract. I'm not sure I understand your argument about the breach of contract. Why isn't the harm he suffered pursuant to the breach the correct measure of damages rather than his salary and his stock options? Because at the time, what was a benefit Mr. Mosher bargained for at the time he entered into the contract? He had a right. And these are also facts that are admitted. If you look at separate statement of facts, 17 and 118, the defendants admitted as undisputed that Mr. Mosher had a right to $1.3 million in salary and $350,000 in options. And that the contract, the settlement agreement, was conditional in its release of his right of that. So he received $500,000 and released his right to the remainder of the salary and his options for peace, for the confidentiality, for an agreement that he was not terminated for cause for what he discovered, and that any statement that was made would say only that the parties had resolved their issues. The contract itself says, except as provided herein and subject to the terms, conditions, and covenants, that the defendants are released. That's a conditional release. And the defendants have admitted in the statement of facts that the disclosure was the very thing that would render that release, would derogate that release. And therefore, the claims he had were the claims he gave up. The value of what he gave up for these conditions was the remainder of his salary and the stock options. Otherwise, as the court said, he was bargaining to avoid future litigation. Well, by that argument, every contract you entered into is just a contract for future litigation. But does he get to keep the $500,000? Very interesting point. If you read the contract, it says that the defendants will unconditionally, it uses the terms, unconditionally, irrevocably, pay the $500,000. So if you read the terms literally, he doesn't have to. If you follow that he's asking for rescission, as the district court addressed, then there would be a return or an offset, in this case, of the $500,000. But what he did is give up $1.3 million plus 350,000 options in return for $500,000 and the remaining non-monetary conditions. And again, in his declaration, in the statement of facts, which the defendants didn't dispute, they agreed. Those were the conditions. It was a conditional release. So for the court to argue it appeared to be unconditional, the court didn't look at the statement of facts and the responses. If it's undisputed, then what are we arguing? They admit it was a conditional release. They admit that this disclosure was the very type of thing that was meant to be prevented by these terms. So how at a minimum, again, can't that raise a genuine issue of material fact and dispute? We're the only ones that provided the facts. And there were even more facts we provided that the court struck without stating any reason, even though they were provided before the hearing, in compliance with Rule 56C. And the court gave no reason, struck those, and allowed late filings of responding declarations by the defendants. So how can this not go to court when we've provided the facts, they have not disputed the facts? How can't that be a determination? How is a matter of laws a court deciding when this is an issue of fact? Well, let me ask you this question. This disclosure about the settlement with former officer that went into the prospectus, what is your position on whether that was required by the rules of the SEC? It absolutely was not required. And thank you for asking that question. What we provided as facts as well was every single report prior to that time did not include any issue of determination of Mr. Moser. The facts we provided were that the underwriters were concerned that Mr. Moser had raised issues of financial irregularities. Why was he terminated? What was happening is the underwriters who then, they buy the stock and sell it. They're required to have truthful facts in the prospectus. The underwriters demanded an explanation, not the SEC, the underwriters. The underwriters wanted a truthful explanation because they're going to have to present this to potential investors. What happened was the defendant's attorney first said we don't want, and that was his advice, we don't need any kind of a disclosure. When the underwriters said we want one, they chose a false and non-accurate disclosure. So it wasn't the SEC that required it. They'd never reported it. Thirty-one times before they reported without ever saying a thing of this nature. It was because the underwriters who have to sell the stock with the prospectus wanted a disclosure. It was the underwriters who wanted a truthful disclosure. What they got was a false one. So the question then is, yeah, the SEC would have been interested because it was a false disclosure, but they weren't requiring the disclosure in the first place. That's a red herring. A red herring to say that this would have happened anyway because the underwriters demanded. No, the underwriters demanded an explanation, not a phony explanation, not a false one that breached the contract. Moreover, the defendants could have said we have a contract. It limits what we can say. That's their burden to show the evidence they did that. They didn't do that. So there was no requirement for this disclosure. It was gratuitous so that they could sell this stock and have an easy time with the underwriters. They weren't required. They could have used other underwriters if they wanted. I'd like to reserve time then if the Court has no further questions. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I'm Tom Reichert. I'm here on behalf of the appellees except for Treyarch and Mr. Schor. And Mr. Lyman will be arguing on their behalf. I would ask that we divide our time so that he gets five minutes to 20 minutes to have his say as well. Well, you keep track of that. Yes, thank you, Your Honor. Because I get so engrossed in these arguments that I can't, you know, I don't even look at the time. Well, we get excited, Your Honor. It's been a long time we've been with this case, though. Yeah. Your Honors, Judge Nelson, you asked the best questions. On Kanarek v. Bugliosi, I'm going to buy both your paperback and the hardcover version of your book, Your Honor. Don't read it. Then it will be like a lot of other books in my library right now. I seem to buy a lot more than I manage to get through. That case, Your Honor, and this Court's case in Cassano v. Klein from 2001, completely and conclusively dispose of Mr. Dane's argument. Because the Kanarek case says that in that instance you had a hardcover book. It was subsequently republished as a paperback book. And what the Kanarek Court said was that when you have a situation like that, that is a republication. This Court, relying on Kanarek itself and on the Shively case, which came after it, this Court said even if you have one hardcover book and multiple printings of it, each of those multiple printings would not constitute a republication for purposes of California law. Now, I happen to have a lot of copies of Harry Potter books. They're all first editions, but many of them are the 43rd, 44th, 45th printing. And under this Court's decision in the Cassano v. Klein case, what it said was even if the first printing was in 2001 and the 43rd printing is in 2007, it's still just one printing, one publication for purposes of California libel law. But isn't the determining issue whether you have a change in audience? And isn't it possible that because of the timing and purposes of these various sales that one could argue that there is a different audience? I don't think so, Your Honor. Judge Lynn, actually, if that was true, now, of course, Mr. Dane said you have to go out and affirmatively get it. But if that was true, every time someone ordered a book off of Amazon.com, it would be a new publication because if you had, say, for example, I self-published a book and I went to Missouri to sell it, and then I took it on the road up to Montana, and then I took it over to North Carolina, et cetera, et cetera. It's one book. It's one publication. I'm going from county to county trying to sell it. That's still one publication, and the law in California is clear about that. Well, let's say that you increase the font size by a factor of ten so that those who are visually impaired could read it and they couldn't read it before. Is that a new audience? It's exactly the same content. Right. All you've changed is the format, which is similar to hard copy, soft copy. That's like the Kanarick case. That's right. It is true. And I think that the answer in that instance is if you have the same thing, that's what the Kanarick case specifically said, same content, different cover, it's a different publication. But publication is used in a very technical way in this area of Bible law. But the point here, Your Honor, is that in this instance, those are not the facts. In fact, the declaration of Robin Pruitt is extremely clear. Now, Mr. Dane cited to it. It's in the record. It's in the excerpt of record, and it's on page 622 of the excerpt of record. And what she says is very simple. What she says is that there were only two prospectuses. There was a draft prospectus that was printed on September 2nd, and then there was a final prospectus that was printed on September 26th. There was no other prospectus. So the prospectus that we're talking about from October is the prospectus that was printed in September. There was no subsequent document with different fonts, different hardcovers or paperbacks, different fonts, different anything. Was the prospectus put in evidence? I believe the prospectus is in evidence, Your Honor, because Mr. Two different dates, September. There's a draft. And then October 23rd. Those two are in evidence. I believe so, Your Honor. They're identical. Well, they are identical for purposes of what we're talking about with Mr. Mosier. What happens is, and Mr. Dane testified a lot to what happens in the process of offering stock. None of it was with declarations or, you know, supported by evidence. I don't want to tread too far into that area. But the way it works, Your Honor, is when you're going to sell stock, you have to submit your form to the SEC. And you can't actually sell it until the SEC approves your form. And so what happens is you don't know exactly what the price you're going to sell it at is, and you don't know whether the SEC is going to approve it. Now, in this particular instance, when we submitted or Encore submitted their form to the SEC, they left the price that they were going to sell the stock at blank because you didn't know where the market was going to be by the time it finally gets approved. The SEC ultimately approved the form exactly as is, which is actually rare. And so then the next day they filled in the dollar sign, the amount they were going to sell the stock for. Everything else was exactly the same. And it was printed and sent out. So that's the only difference. But with regards to what we're talking about with Mr. Mosher, that language was unchanged between the first and the second document. All right. But here again, he kept saying that it was your burden to introduce those into evidence, and you didn't. Well, Your Honor, he actually attached the language to his complaint. But here we actually introduced the declaration from Ms. Pruitt saying they were exactly the same. He did not introduce any contrary evidence that said they're not the same, and that's because they aren't the same. There's no difference except for that. And in any event, Your Honor, the point is that he did not file suit until October 18th of 2004. The undisputed evidence from Ms. Pruitt's declaration, which is the only declaration and evidence we have on this issue, everything else that Mr. Mosher and Mr. Gaines say is just conjecture. The only evidence we have is that both of those prospectuses was printed and shipped and distributed in September of 2003. He filed suit in October of 2004, over a year later, and that's the dispositive question. Am I correct that the Pruitt declaration was filed with a reply brief? There were two, Your Honor. There was one that was filed to be candid. This issue about the overage was never an issue in this case until Mr. Mosher filed his opposition to our summary judgment motion. If you were to look at the briefs, you'd see there were a number of other filings, and he actually talks about this in his reply brief. There were a number of other filings down the road, and he tried to use those as a jumping-off point to extend his statute of limitations. He's abandoned all of those arguments, but for purposes of his opposition to the summary judgment motion, for the very first time he talked about this overage issue and tried to sort of show through that press release, tried to use that as the hook to extend his statute of limitations. So we did include a declaration from Ms. Pruitt in response that said, to clarify, this was the only one. Okay, but you put in evidence in connection with your reply brief  and they tender some responsive material, all of which gets stricken. Now, I know this is bulky, massive filing just before the hearing, but the fact of the matter is you put in new evidence in the reply and they were prevented from either striking it or responding to it. Is that a correct assessment of the record? It is, but I think it's incomplete, Your Honor. I mean, as you say, here we had six weeks between when we filed our reply briefs and when the hearing was, and the hearing was set for the Tuesday before Thanksgiving. Friday afternoon, after the close of business, they e-filed the supplemental 89-page declaration with 250 pages of exhibits to quote, unquote, respond to 10 paragraphs that I submitted of declarations in my reply. Now, in this particular instance, the court, certainly it's within the court's judicial discretion in the management of its docket and its cases to strike something that is filed under those circumstances. In any event, Mr. Moser hasn't pointed to anything. I mean, he's cited, he's actually cited in his appellate record, in his briefs, to all of that material, and he hasn't shown anything that supports the fact that it would have gone differently if it had been considered by the court, because on this issue, on this issue about the timing of the publications, there was no evidence from any underwriter. There was no evidence from anyone. The only evidence, he says we didn't introduce evidence. I introduced over 300 pages of evidence on my summary judgment motions, and the only evidence on this particular issue is from Robin Pruitt, the general counsel of the company, and on this particular issue, Judge Lynn, on the issue about the timing, we tried to clarify it in our supplemental brief because, as I said, it was only raised by him in opposition for the first time. We were caught by unawares, to be candid, because it was not an issue that had ever been identified in interrogatories or in any of the discovery. So we tried to clarify it, but if you look in Ms. Pruitt's original declaration, which was submitted with our motion for summary judgment, she says the same thing. I just, being a lawyer, wanted to make it a little clearer. That's what happened. Now, on this issue, Your Honor, relating to the question of the contract, again, Judge Nelson, I think your question was spot on. Mr. Moser was a lawyer. He was hired by a company to be its general counsel after being its outside lawyer. He started in November. By March, he was in terrible fights with his chief financial officer, and in early April, he accused the chief financial officer of being incompetent and the CEO of lying to him. There was an investigation. He was placed on leave. An investigation was conducted. Ultimately, he was terminated because he's a lawyer. His client, the CEO and the board of directors, had lost faith in him, given what happened, and the things that he said and the things that he has continued to say to this day explain exactly why that happened. But there was then a settlement agreement. He was paid $500,000 for working for this company for four months, for four months, and he gave up a lot of options. He bought peace. That's what he said before. That's exactly what he bought. There was a settlement agreement wherein he had never filed a lawsuit. There was some mediation that was done before a mediator. The parties negotiated a settlement so that he could move back to Phoenix and Squire Sanders, where he continues to be a partner, and the company could move forward. The company, after that, did very well. And the options that there was a question, the company said, you aren't entitled to them. He said, I am. That was all given up as part of the settlement agreement, the dispute about what he was entitled to. But the company did well, and those options, if they had existed, would have been valuable. There's a filing, and he files a lawsuit. He says the settlement agreement is breached. The remedy for that would be for him to get back his inchoate right to bring a claim for those benefits, not to get the benefits themselves. This is not a lawsuit about his employment agreement. This is not a lawsuit that's about whether or not he's entitled to those options under his employment agreement, although he's continued and tried over and over to make it so. That's what his statement of damages said. And that's why the court below, in a 59-page opinion, went through this at extreme length and correctly said, you have stated the wrong damages, because what you're looking for are damages not for this lawsuit, but for the lawsuit that you're trying to get back the right to bring if you win this lawsuit. This is a case, it's one of those meta situations, you know, that we talk about these days. It's, you know, it's the layer cake. You know, if you win this lawsuit, you get the right to bring another lawsuit. Now, he says, and Judge Lynn asked, you asked the question, what about the $500,000? And what Mr. Daines said very quickly was it would be an offset, not under California law. Under California law, you don't get the right to an offset. The case law that we cite from Syme, the Myerton case, and now just recently the Village of Northridge Homeowners Association cases, all say that in order to support the favored policy of settlement of disputes, if you have a situation where you settle and you get paid money, if you're going to then sue saying that the settlement agreement was breached, you've got to give the money back before you can bring a lawsuit. That's what Justice Chin said very clearly in the Northridge case. It's what every case has said in California, because the alternative is, essentially, from my client's perspective, which did buy peace, or thought it did, thought it bought peace from this dispute that's been going on now for 10 years, but from my client's perspective, it paid him half a million dollars to go away and never come back, and now he wants to bring another lawsuit and keep the $500,000 at the same time. Well, that's just not the way the law works in California. The law on rescission is clear. The statement of damages, the theory of damages is clear, and in this instance, it's not supported by the way he articulated his claims. Finally, I'm surprised to hear that these descriptions about my separate statement, my response to the separate statement. First, just so you know, in the Southern District of California, a separate statement is not required in connection with a summary judgment motion, as it is in the Central District, which is where I mostly spend my time. But he filed a separate statement in his opposition, and we responded to it. I can say quite clearly that I did dispute just about everything he says was undisputed. He didn't cite, it's all in the excerpts of record, the excerpts of record. My response to his separate statement is excerpts of record starting at page 521. It's extremely long because, as with everything that Mr. Moser files, a 90-page declaration, it was hundreds and hundreds of separate statement items. I was the one at 2 a.m. going through and responding, and I disputed just about everything in there. There are some instances where I said this is not a material, you know, for summary judgment, it has to be a genuine issue of a material. A genuine dispute is to a material fact. Sometimes I say this isn't a material fact. Sometimes I say there's no genuine dispute about this. But as a general rule, I did dispute just about everything, and so I'm surprised to hear that today. But it's in the record if the Court wants to look at it further. I've spoken too much, as I always do. I apologize to you and to Mr. Lyman. I will now leave if the Court has no further questions. All right. Thank you. Thank you. May it please the Court, my name is Louis Lyman, and I represent Appellee's Bryan Shore and Triarc Companies. Your Honors, I will be brief. We join in all of the arguments that are made by Encore and by the Encore defendants. In addition to those arguments, as Judge Sammartino properly recognized, there are important principles that should lead to and should lead to the dismissal of my clients from this case. Mr. Shore, as Your Honors will know from the papers, sole relationship to this case is that he is a lawyer for the Triarc Companies. The Triarc Companies are an investor in Encore. Three of the Triarc employees were on the board of Encore at the relevant time period. Mr. Shore provided legal advice to those employees in connection with an SEC filing. That's not cautious conduct. That's not improper conduct. It's conduct that is privileged, and that's conduct that the law should encourage people to do, both the directors to reach out to counsel to get advice and counsel to provide that advice. Triarc Companies' relationship to this case is, in fact, even more distant. It has had an ownership interest in the Encore Companies, as many companies do that have an ownership interest. It had employees who were on the board of directors of Encore. That does not subject Triarc to liability for any torts, even if Mr. Moser were able to establish evidence that there were any torts. And its general counsel, Mr. Shore, provided advice to the directors who served on the Encore board. The variety of principles, the variety of doctrines of law recognized by Judge Sammartino, regardless of the outcome with respect to Encore, the judgment should be affirmed with respect to my clients. I just want to respond very briefly to two points with respect to the statute of limitations and with respect to the notice of lodgment. With respect to the statute of limitations, Mr. Dane argued that there was a live claim against the Triarc Companies. As your honors will know from the papers, Triarc was not sued in this case until September of 2005. The S-1 was published in September of 2003, over two years later. The language of the Single Uniform Publication Act refers to any other claim founded upon single publication, exhibition, or utterance. In this case, the claim of tortious interference or intentional interference, which is the claim made against Triarc, is based upon that utterance or statement, the statement in the S-1. My client was not present for the September of 2005 meeting among counsel. And then finally, your honor, Judge Lind referred to the notice of lodgment. I would note that with respect to Triarc and Mr. Schor, we submitted two documents in connection with the notice of lodgment that Mr. Dane is complaining about. One of those documents is one of the 18 emails that Mr. Moser referred to over and over again in his briefs. We put that email in front of the court because it supported Mr. Schor's argument. There's never been any objection to the authenticity of that document. It's what Mr. Dane has been relying on. And the second bit that we put in was a snippet from the deposition of Judge Smith from the New York Court of Appeals who conducted the investigation in this case. That snippet from Judge Smith's deposition was also in the original notice of lodgment, and so there would be no prejudice by having submitted those materials when we did. If the court has no questions, we'll rest on our briefs. Thank you very much. Thank you, Your Honor. Your Honor, responding to the Encore defendant's arguments, there was a new separate sale to investors. And as counsel just said, actually, and now he's saying the first Pruitt declaration indicated that the first prospectus and the second prospectus were different. They weren't identical. What he's saying is identical is the defamatory material. The disclosure was identical. But that's not what the cases say. The defamatory information can be identical. The only change is to the new audience. That's what these cases are talking about. And when you have one sale, a public sale of original 5 million shares of stock, and then later you have an over allotment, a separate sale, and I go to Mr. Schor and Treyarch, they admitted as undisputed, undisputed, that it was a separate prospectus, separately sold stock and separately delivered to investors on or after October 21st. A new audience. Now, Schor and Treyarch admitted, I think, all but four of the facts. The Encore defendants had many facts where they just didn't admit or deny. They made some objections. Some were undisputed. But on these critical facts, at least, even if Schor and Treyarch admitted, that's evidence. That places a material fact in issue. That's the point. They have to prove conclusively. They have not done that. Saying that Schor and Treyarch had minimal involvement, if the court doesn't, I apologize. I don't have the record. But the statement of facts that we submitted and their responses, 147, 153, and 162, all admitted as undisputed. And those say separate prospectus, separate sale. 162 admits it was a defamatory prospectus that was used by the defendants and admits that Schor, who was on behalf of Treyarch, who was required to approve this disclosure, knew the evidence was false and failed to say anything, as did the other Encore management. By the way, again, if we go to the USPA, that only says one cause of action. We have an inducement for breach of contract. That survives. That's two years. Even if the defamation fails, that survives. Well, how did it happen that the year period passed? Which year period? The one-year statute of limitations. Because we're basing it on the October 21st. No, but how did it happen? That one year from the first publication, how did it happen that it was filed after? That, unfortunately, would be an attorney-client privilege. That's not part of the record, why we chose to file on the day we chose to file. I'm curious. That's all. You've answered the question. Okay, well, I'll tell you, because an investor called us at a certain point in time, or an analyst, questioning it. And that was our basis, questioning what this was about. I mean, if you're asking me, when I personally became aware. So that's the basis for that. Triarch was sued later because we got additional information. So I guess I can answer that. My discussions are not part attorney-client privilege, but that's not. No further questions. Thank you, Your Honor. Okay, thank you. I appreciate the arguments, and all matters heard today are submitted. Thank you.
judges: Lynn, Pregerson, Nelson